1
2
3
4
5
6

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

7   CAROLINE WILMUTH, KATHERINE SCHOMER, and ERIN COMBS, on behalf of themselves and all others similarly situated,

8                       Plaintiffs,

9

10          vs.

11  AMAZON.com, Inc.,

12                      Defendant.

Case No. 2:23-cv-01774

**FIRST AMENDED COMPLAINT— CLASS AND COLLECTIVE ACTION**

JURY DEMAND

13
14
15
16
17
18
19
20
21
22
23
24
25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page i

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

## **TABLE OF CONTENTS**

I.      SUMMARY OF CLAIMS ........................................................................... 1

II.     PARTIES .................................................................................................. 2

III.    JURISDICTION AND VENUE ................................................................. 2

IV.     ADMINISTRATIVE PROCEDURES ........................................................ 3

V.      COMMON FACTUAL ALLEGATIONS.................................................... 3

     A.   Amazon's Violations of Equal Pay Laws ...................................... 3

     B.   Amazon's Unitary Operations, Centralized Decisionmaking, and
        Uniform Policies ........................................................................... 4

     C.   Amazon Maintains Common Decisionmaking and Uniform
        Policies as to Hiring and Promotions............................................. 7

     D.   Amazon Maintains Common Decisionmaking and Uniform
        Policies as to Its Job Architecture ................................................. 9

        1.   The Job Architecture.......................................................... 9

        2.   Job Levels ........................................................................ 10

        3.   Job Families ..................................................................... 10

        4.   Job Codes ......................................................................... 10

     E.   Amazon Maintains Common Decisionmaking and Uniform
        Policies as to Its Compensation ................................................... 11

     F.   Amazon Maintains Common Promotion Processes, Including
        Standardized Metrics, Application Processes, and Timelines ...... 11

     G.   Amazon Maintains Common Evaluation Processes, Including
        Forced Ranking, and "Unregretted Attrition Goals" to Meet
        Termination Quotas ...................................................................... 12

VI.     COLLECTIVE ACTION ALLEGATIONS ............................................. 13

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page ii

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

VII.  CLASS ACTION ALLEGATIONS ................................................................... 15

VIII.  INDIVIDUAL PLAINTIFF FACTUAL ALLEGATIONS ..................................... 17

    A.  Background ............................................................................................. 17

        1.  Plaintiff Caroline Wilmuth. ........................................................ 17

        2.  Plaintiff Erin Combs. .................................................................. 18

        3.  Plaintiff Katherine Schomer ........................................................ 19

    B.  Amazon Has Paid Ms. Wilmuth and Ms. Schomer Less than Male
        Researchers Performing the Same or Lesser Work ...................................... 19

    C.  Amazon Has Subjected Ms. Wilmuth and Ms. Combs to Inferior
        Treatment Based on Their Gender .............................................................. 23

    D.  Plaintiffs Have Repeatedly Raised Concerns About Gender
        Discrimination, But Amazon Has Failed to Remedy the Problems ............. 25

        1.  Plaintiff Caroline Wilmuth. ........................................................ 25

        2.  Plaintiff Erin Combs. .................................................................. 29

        3.  Plaintiff Katherine Schomer ........................................................ 31

    E.  Amazon Retaliated Against Plaintiffs by Demoting Them Within
        Weeks of Each Engaging in Protected Activity ........................................... 32

    F.  Amazon Failed to Take Any Corrective Action in Response to
        Plaintiffs' Complaints ................................................................................ 34

    G.  Amazon Continues to Discriminate and Retaliate Against
        Plaintiffs ................................................................................................... 36

        1.  Plaintiff Caroline Wilmuth. ........................................................ 37

        2.  Plaintiff Katherine Schomer ........................................................ 38

        3.  Plaintiff Erin Combs ................................................................... 39

IX.  CAUSES OF ACTION ....................................................................................... 42

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page iii

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

FIRST CLAIM ................................................................................ 42

SECOND CLAIM ........................................................................... 42

THIRD CLAIM ............................................................................... 43

FOURTH CLAIM ........................................................................... 44

FIFTH CLAIM ................................................................................ 44

SIXTH CLAIM ............................................................................... 45

SEVENTH CLAIM ......................................................................... 45

EIGHTH CLAIM ............................................................................ 46

NINTH CLAIM .............................................................................. 47

TENTH CLAIM .............................................................................. 47

X.      PRAYER FOR RELIEF ................................................................. 48

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1   Plaintiffs Caroline Wilmuth, Katherine Schomer, and Erin Combs ("Plaintiffs"), on behalf

2   of themselves and all others similarly situated, allege as follows:

3   **I.       SUMMARY OF CLAIMS**

4           1.      This action is brought against Defendant Amazon.com, Inc. ("Amazon" or

5   "Defendant") to challenge its systemic discrimination against its female employees.

6           2.      Plaintiffs allege, on a class- and collective-wide basis, that Amazon has

7   discriminated against them and similarly situated women by paying them less than comparable

8   men, in violation of the Washington Equal Pay and Opportunities Act, RCW 49.58.010 *et seq.*

9   ("EPOA") and the federal Equal Pay Act, 29 U.S.C. § 206 *et seq.* ("EPA"), respectively

10  (collectively, the "Class Claims"[1]). Specially Plaintiffs allege that Amazon has violated and

11  continues to violate the EPOA and EPA by: (a) paying women less than it pays men for

12  performing similar work within job levels; and (b) assigning women to lower paying job codes

13  then it assigns to men.

14          3.      Plaintiffs also allege that Amazon has discriminated against them in

15  additional ways because of their gender and for taking medical leave and that it has retaliated

16  against them for raising protected complaints about the discrimination Amazon has

17  perpetrated, in violation of the Washington Law Against Discrimination, RCW 49.60.030(1) &

18  49.60.210(1) ("WLAD"); Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title

19  VII"); the Washington Paid Family and Medical Leave Act, RCW 50A.35.010 ("Washington

20  FMLA") and the federal Family and Medical Leave Act ("FMLA"), 29 C.F.R. § 825.214

21  (collectively, the "Individual Claims"). While Plaintiffs believe that women besides

22  themselves likely have claims similar or legally identical to the Individual Claims, those claims

23  _____

24  [1]      For simplicity's sake, Plaintiffs will often use "class" as an adjective to describe concepts
    that apply to various representative procedural devices, including the class action device and the
25  collective action device

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1    are not asserted herein.

2    **II.    PARTIES**

3           4.    Plaintiff **Caroline Wilmuth** is a woman residing in King County,

4    Washington.  She worked as an L7 General Marketing Manager within Amazon's Worldwide

5    Communications ("WWC") and Amazon in the Community ("AITC") organizations between

6    2017 and 2024.

7           5.    Plaintiff **Katherine Schomer** is a woman residing in King County,

8    Washington.  She started as an L7 Head of Market Intelligence for Executive Recruiting in

9    2019 and is now a General Marketing Manager within the WWC organization for Amazon.

10          6.    Plaintiff **Erin Combs** is a woman residing in King County, Washington.

11   She worked as an L7 General Marketing Manager within the WWC and AITC organizations

12   between 2020 and 2023.

13          7.    Defendant **Amazon.com, Inc.** is a Delaware corporation headquartered in

14   King County and doing business throughout Washington State and the United States.

15          8.    Amazon is an "employer" subject to Washington State statutes governing

16   employment discrimination, retaliation, and equal pay, including the EPOA and the WLAD.

17   **III.    JURISDICTION AND VENUE**

18          9.    This Court has original subject matter jurisdiction over the federal EPA

19   and Title VII claims pursuant to 28 U.S.C. § 1331 and Sections 206(d) and 216(b) of the Fair

20   Labor Standards Act, 29 U.S.C. §§ 206(d), 216(b).

21          10.   This Court has supplemental jurisdiction over the state law claims under

22   28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the

23   federal claims and are so related to the federal claims as to form part of the same case or

24   controversy under Article III of the United States Constitution.

25

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1    11.     This Court has personal jurisdiction over Amazon because the company

2  does business in this District and because some of the acts complained of, and giving rise to the

3  claims alleged, occurred in and emanated from this District.

4    12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a

5  substantial part of the events giving rise to the claims occurred in this District.

6    13.     At all times material to this action, Plaintiffs were residents of King

7  County, Washington.

8    14.     At all relevant times, Amazon employed Plaintiffs in King County,

9  Washington.

10    15.     The events, acts, and omissions giving rise to Plaintiffs' claims alleged

11  herein occurred primarily in King County, Washington.

12  **IV.   ADMINISTRATIVE PROCEDURES**

13    16.     Plaintiffs have each filed a Charge of Discrimination with the Equal

14  Employment Opportunity Commission ("EEOC").

15    17.     On December 6, 2023, the EEOC issued Notices of Right to Sue for each

16  Plaintiff.

17    18.     Any and all other prerequisites to the filing of this suit have been met.

18  **V.    COMMON FACTUAL ALLEGATIONS**

19    **A.    Amazon's Violations of Equal Pay Laws**

20    19.     Amazon has systematically paid and continues to pay female employees

21  lower compensation than it has paid and continues to pay men performing substantially equal

22  or similar work.

23    20.     Specially, Amazon has paid and pays women, including Plaintiffs, less

24  than men within the same job level, even though Amazon acknowledges that employees in the

25

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1   same job level perform substantially equal or similar work.

2           21.     Amazon also tracks women, including Plaintiffs Wilmuth and Schomer,

3 into lower paying job codes, while assigning men to higher paying adjacent job codes, resulting

4 in female employees being cabined to lower paying work.  For example, Ms. Wilmuth and Ms.

5 Schomer were assigned marketing job codes, but Amazon assigned men performing substantially

6 similar work in research job codes.  Because Amazon provides for a significantly higher salary

7 scale for researchers than marketers – even at the same level – Amazon paid Ms. Wilmuth and

8 Ms. Schomer less money than their male counterparts and even a male direct report of Ms.

9 Wilmuth's.  Upon information and belief, female employees throughout Amazon are routinely

10 assigned similar but lower-paying job codes.

11           22.     At all relevant times, Amazon has known or should have known of the pay

12 disparity between women and comparable men, yet Amazon has taken no action to remedy the

13 unequal compensation between women and similarly situated men.  Amazon's failure to pay

14 women the same compensation paid to men for substantially equal or substantially similar work

15 has been and is willful.

16       **B.**     **Amazon's Unitary Operations, Centralized Decisionmaking, and Uniform**

17               **Policies**

18           23.     Amazon is among the world's largest e-commerce and technology

19 companies and is continually expanding into new sectors.

20           24.     Since its inception in 1997, and especially as the company has grown and

21 expanded, Amazon prides itself on instilling a common culture and set of guiding principles for

22 every employee, regardless of their team or location. As a result, Amazon employs a highly

23 scaled and focused hierarchy with rigid top-down principles that govern its job architecture and

24 compensation.

25

25. The company has a strong, consistent culture centered on Amazon's "16 Leadership Principles," described by former Amazon employee Kristi Coulter as the "Amazon Commandments: a set of values and behaviors that show up everywhere from hiring loops to performance reviews to routine team meetings." Kristi Coulter, *Exit Interview*, 17 (2023). The Leadership Principles drive Amazon's corporate strategy and culture, including its philosophy of managing the employee experience, and exemplify Amazon's emphasis on policies and practices that maximize its ability to constantly scale up.

26. That uniform approach has resulted in strong consistency in employment practices, achieved in part through standard corporate-wide structures, policies, and practices. For example, Amazon has built and maintains centralized human resources ("HR") structures and processes. Thus, Amazon's job architecture, hiring and onboarding processes, compensation determinations, performance measurement systems, and promotion decisions are highly standardized. The consistency also carries through to day-to-day work through the Leadership Principles. Throughout the company, regardless of a given employee's job code, team, level, organizational location, or geographic location, Amazon expects each employee to exemplify and abide by – and analyzes their performance based on – these 16 Leadership Principles.

27. Amazon also employs a highly structured and systematized work environment that allows employees to work interchangeably and frequently move between teams. Kristi Coulter calls this movement of interchangeable employees "Amazon Boggle." *Exit Interview* at 108.

28. Teams commonly include employees from multiple different cities, and even different countries. For example, Plaintiff Wilmuth estimates that the 15 individuals on her team worked in 8 different states at one point. Plaintiffs Schomer and Combs similarly both

Outten & Golden LLP
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

have had direct reports and managers in their chain of command who work or worked outside of Washington.

29.     Amazon's job postings also reflect the cohesive, cross-geographic nature of Amazon's workplace. Amazon postings often explicitly note that the role can be fulfilled out of any of multiple offices.

30.     Similarly, employees' primary HR contacts are frequently located in different states from the employees.

31.     Amazon's 2023 10-K Report filed with the SEC reports employment information for the whole company, on behalf of all subsidiaries, without distinguishing between them.[2] Specifically, Amazon states that "[a]s of December 31, 2023, we employed approximately 1,525,000 full-time and part-time employees."[3] Upon information and belief, there are no 10-K Reports for any individual Amazon subsidiary or entity.

32.     Similarly, Amazon describes itself to the EEOC in its yearly EEO-1 Employer Information Reports as a unitary company, with "Amazon.com, Inc." as the sole employer of record.[4] Amazon's 2021 EEO-1 submission to the EEOC lists 1,120,602 total workers, of whom 761,568 are "laborers & helpers," 65,123 are listed in one of two categories of "officials & mgrs," 121,182 are "professionals," and the rest are listed in various other categories. Upon information and belief, Amazon does not create or submit separate EEO-1 Reports for its subsidiaries or any other entity.

---

[2]     *See* Form 10-K – Amazon.com, Inc., U.S. Securities & Exchange Comm'n (Feb. 1, 2024) at 4, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/c7c14359-36fa-40c3-b3ca-5bf7f3fa0b96.pdf (last accessed Feb. 8, 2024).
[3]     *Id.* at 42.
[4]     *See* 2021 EEO-1 Report, https://assets.aboutamazon.com/ff/dc/30bf8e3d41c7b250651f337a29c7/2021-amazon-consolidated-eeo-1-report-2p.pdf (last accessed Feb. 8, 2024).

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

33.     On its website, Amazon consistently describes itself as a unitary company. For example, on a web page titled "Our workforce data," Amazon states, "we will continue to strive for better representation across our *company*," followed by several graphs describing demographics for the whole company, without distinguishing between subsidiaries, geographic locations within the United States, or departments.[5]

**C.     Amazon Maintains Common Decisionmaking and Uniform Policies as to Hiring and Promotions.**

34.     Amazon has a centralized HR department, headed by Beth Galetti, Senior Vice President for People eXperience and Technology, which implements and dispenses all of Amazon's personnel processes, including hiring, job code and level assignments, promotion, and job evaluations, all of which impact Amazon employees' compensation.

35.     Amazon ensures that each corporate employee goes through a hyper-standardized hiring process, regardless of the role, to determine if the employee is a good fit, not only for a specific role, but also for Amazon's culture.

36.     Candidates who make it past Amazon's initial screening complete a "full hiring loop," during which they participate in multiple interviews with panels of Amazon employees.

37.     For every hiring loop, Amazon assigns a "Bar Raiser," which is a "trained and trusted interviewer who sits in on meetings to evaluate candidates across the company for 'culture fit.'"  Kristi Coulter, *Exit Interview*, at 148.  The Bar Raiser sits in on every interview in the hiring loop, contributes feedback on the candidate, and joins the subsequent decisionmaking conversations.  Bar Raisers are designed to play a two-part role: (a) to ensure the candidate meets

---

[5]     *Our workforce data*, Amazon.com, https://www.aboutamazon.com/news/workplace/our-workforce-data (last accessed Feb. 8, 2024) (emphasis added).

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

the baseline qualifications for the job family and level, and (b) to ensure the candidate is a good "culture fit" for Amazon.  To ensure standardization in the company, Amazon generally requires that Bar Raisers come from outside the team doing the hiring. Amazon puts Bar Raisers through special training to train them for the role.  Amazon relies on each Bar Raiser to participate in hundreds of hiring loops.[6]

38.     In addition to the careful use of Bar Raisers, Amazon requires *all* employees who participate in interview loops to go through the same mandatory training called Making Great Hiring Decisions ("MGHD").  Through the MGHD training, Amazon teaches employees Amazon's unique process for interview loops – down to the exact questions interviews must ask.  Amazon instructs interviewers to draw their questions from the Amazon Interview Question Bank ("AIQB"), with specially-designed questions intended to make sure, regardless of the particular job role, team, or location, that the employee is the right "fit."

39.     The heart of every question asked in the hiring loop – and the metrics by which the candidates are judged – is Amazon's "16 Leadership Principles." Amazon credits "employ[ing] Amazon's leadership Principles every day" as a key to its success.  Daniel Slater, the Worldwide Head of Culture of Innovation at Amazon Web Services describes it as the "primary reason" why, "as the company scaled," Amazon has retained its ability to "maintain [its] culture of innovation."[7]  Amazon expects employees at all levels of the company to consciously embody these principles on a day-to-day basis.  The Principles are a "common vernacular" across the entire company.[8]  The Principles are "embedded in [Amazon's] hiring

---

[6]     Kristi Coulter, *Exit Interview* at 148 (2023).

[7]     Daniel Slater, *Leading and Innovating with Leadership Principles*, https://aws.amazon.com/executive-insights/content/leading-and-innovating-with-leadership-principles/ (last accessed Jan. 31, 2024).

[8]     *Id.*

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 8

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

processes: we give them to candidates prior to their interview, and evaluate their examples by how their decisionmaking and problem-solving demonstrates different Leadership Principles."[9]

40.     Amazon generally assigns each interviewer on a given loop one or two specific Leadership Principles as their focus.  Their role in the interview is only to ask candidates about that specific Principle and to provide written feedback on how the candidate responds.

41.     Plaintiff Wilmuth, for example, participated in over 75 interviews during her time at Amazon, and each one operated this way.

42.     Amazon consistently uses this uniform hiring process for corporate applicants and evaluates their candidacy by the same metrics.

**D.     Amazon Maintains Common Decisionmaking and Uniform Policies as to Its Job Architecture.**

**1.     The Job Architecture**

43.     As described below, Amazon has created a rigid job architecture intended to provide a framework for the organization of its employees.  Each job code (the work an employee functionally performs) falls within a larger job family (comprised of multiple related job codes).  Separately, individuals are assigned a job level that is intended to reflect their education, experience, and skills. The intersection of an individual's job level and job code determine their compensation.  Amazon uses a single set of job coding/leveling structures throughout the company, across its locations, referred to as the "Leveling Guidelines."  Whether an employee is in Seattle, New York, or Mumbai, the same job architecture/Leveling Guidelines apply.

---

[9]     *Id.*

## 2.   Job Levels

44.   Amazon's HR, in conjunction with Bar Raisers, assigns each corporate salaried employee a job level from Level 4 (at the bottom) to Level 12 (at the top) based on a centralized rubric that defines the characteristic of each level in connection with a given job code.

45.   Amazon strictly controls job level assignments. Managers do not have discretion to change an employee's job level.  If a Manager wishes to change the job level for a direct report within the first six months of employment, they must do so by appealing to the Bar Raiser who had been on the employee's hiring panel.  Otherwise, a Manager has to wait at least one year and then put the employee up for promotion in order to raise their level.

## 3.   Job Families

46.   Amazon places each employee within a "job family" based on their job responsibilities.

## 4.   Job Codes

47.   Amazon assigns each employee a "job code," which indicates the work to be performed and job qualifications, based on a range of job codes available for the specific job family.

48.   Amazon's HR, in conjunction with Bar Raisers, assign job codes based on Amazon's Leveling Guidelines.

49.   Managers do not have discretion to change an employee's job code.  If managers believe a job code is incorrect, they must ask Amazon's HR to conduct a job code review.

50.   Amazon maintains companywide Leveling Guidelines governing both job levels and job codes.

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

51.     Once an employee begins working at the company, it is rare for Amazon to change an employee's job code, even if (as regularly occurs) the employee's job duties grow and evolve, the employee's organization is reorganized to add additional job codes, or the employee undergoes an internal transfer to another role.

52.     As a result, upon information and belief, employees within one or more related job families regularly perform substantially similar work to each other even if they have different job codes.

**E.     Amazon Maintains Common Decisionmaking and Uniform Policies as to Its Compensation.**

53.     Across the company, Amazon employees' primary compensation is a combination of a base salary and stock grants (and, for their first two years of employment only, cash bonuses), which are directly based on the employee's job level and job code.

54.     At hire, compensation is determined based on a range associated with the job code and job level assigned by Amazon's HR.  Later, Amazon determines employees' compensation using a single automated algorithm.  An employee's job level, job family, and performance rating (discussed further below) are input into the algorithm, and the algorithm produces a recommended compensation.  Although managers can lobby HR to request a departure from the algorithm's recommendation, it is unusual for Amazon to authorize any such changes.

**F.     Amazon Maintains Common Promotion Processes, Including Standardized Metrics, Application Processes, and Timelines.**

55.     Amazon also maintains a uniform promotion process applicable to all employees.  Within the Leveling Guidelines, Amazon provides metrics for what should be expected of employees at each job level, as well as separate job code-specific metrics for each

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1   job level.  Amazon uses both metrics to guide promotion decisions.

2          56.    There are two promotion cycles each year for levels L7-L10 and four

3   promotion cycles for levels L4-L6, following predetermined timelines.  Amazon requires

4   employees interested in promotions to submit a standardized promotion document, following

5   templates and guidance available for all employees.

6          57.    The promotion document includes the employee and/or manager's written

7   self-assessment of their "skills and experience against the official HR requirements for" the job

8   level the employee seeks.  *Exit Interview* at 216.  "Amazon promotion proposals are dense, data-

9   packed documents."  *Id.*

10          58.    Amazon does not allow employees to be promoted outside of the bi-

11   annual or quarterly promotion process.  That applies to internal transfers as well.  Amazon does

12   not afford discretion to its managers to promote employees.  Employees cannot be promoted up a

13   level by being offered a new role through an internal job posting for an open position at a higher

14   level.  Thus, for example, if a Level 6 employee applies for and is offered a job scoped to be

15   Level 7 on a different team, the employee can accept the role and change teams, but they will not

16   be promoted to or paid as a Level 7, even if they perform all of the Level 7 job duties.  If the

17   employee wants the promotion to Level 7, they must seek it through the standardized promotion

18   process.  Amazon requires an employee to have been in their current role for at least one, often

19   two, years before they are permitted to seek a promotion to a higher level.

20      **G.**    **Amazon Maintains Common Evaluation Processes, Including Forced**

21          **Ranking, and "Unregretted Attrition Goals" to Meet Termination Quotas.**

22          59.    Amazon uses the same processes for employee evaluations and promotion

23   decisions nationwide, regardless of location or organization.

24

25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 12

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

60.     During the annual performance evaluation cycle, Amazon gives each employee two numerical scores: (a) a rating of performance from 1 to 7, and (b) a rating of potential from 1 to 4.  Higher numbers are better.  Amazon then combines those two scores to determine one of five final ratings: (a) "Least Effective," (b) "Highly Valued 1," (c) "Highly Valued 2," (d) "Highly Valued 3," and (e) "Top Tier."

61.     Amazon imposes a forced ranking system that falls along a bell curve, constraining managers' discretion in the review process.  Thus, a manager cannot give all their direct reports the highest score, and the manager must in fact give some employees the lowest score.  This is true across all teams and locations.

62.     Low performance scores have a lasting impact on employees' compensation and eligibility for promotion.  For example, Amazon instructs managers to put any employees who receive a Least Effective rating into the "Focus" program.  Employees in Focus are not eligible for raises or stock grants.  Further, Focus is typically a precursor to Pivot, which is the equivalent of a Performance Improvement Plan (PIP)–and often, to being fired.  The forced ranking system and the consequences of low ratings help Amazon achieve its self-described "unregretted attrition goal."  That goal is, effectively, a quota requiring a certain number of employees to be fired every year companywide, which Amazon does not "regret."

## VI.     COLLECTIVE ACTION ALLEGATIONS

63.     Plaintiffs bring this collective action pursuant to 29 U.S.C. § 216(b) seeking monetary, injunctive, and declaratory relief, on behalf of all women who worked for Amazon in any position in job levels 4-8 ("Covered Positions") at any time from three years before the filing of the initial complaint through the resolution of this action ("EPA Liability Period") (collectively, "Collective Members" or the "Collective") for claims under the federal EPA.

64.     Amazon has maintained and continues to maintain a centrally determined and uniform set of policies and/or practices for determining employees' compensation, including centralized policies and/or practices for setting employees' initial pay and centralized policies and/or practices for giving employees pay raises, bonuses, and company equity.  For example, Amazon's offices use a common organizational structure, organizing employees by job levels and codes.  Amazon's centralized pay structure establishes corporate-imposed compensation ranges based on employees' job code and level.  Amazon's corporate headquarters sets these compensation ranges on a company-wide basis.  These compensation ranges apply across all of Amazon's offices.

65.     Plaintiffs are informed and believe that the policies and practices described in this Complaint – including channeling women to lower levels and to lower paying job codes and paying women less than men within the compensation range for the same job codes and level – adversely affect women in other job positions as well.

66.     Plaintiffs and the Collective Members are similarly situated in that they have been subjected to Amazon's common, nationwide employment policies and practices – including those described above – and pursue the same legal claims under the EPA, having been subjected to the same harm of receiving lower compensation relative to comparable male employees.

67.     There are many similarly situated Collective Members who would benefit from the issuance of a Court-supervised notice of the action and the opportunity to make an individual decision whether to join as opt-ins.  Notice should be sent to the Collective pursuant to 29 U.S.C. § 216(b).

68.     Amazon has engaged in systematic gender discrimination in pay against women through the implementation of common compensation policies and practices that resulted

in a gender pay disparity.

69.     As part of its regular business practice, Amazon has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the EPA with respect to Plaintiffs and the Collective Members.  This policy and pattern or practice includes willfully compensating women less than comparable men.

70.     Amazon has paid Plaintiffs and the Collective Members less than men in the same establishment for work requiring equal skill, effort, and responsibility and performed under similar working conditions.  This unequal pay is not justified by seniority, a merit system, a system that measures earnings by quality or quantity of production, or any factor other than sex.

71.     Plaintiffs seek to represent Collective Members.

72.     The systemic gender discrimination described in this Complaint has been, and is, continuing in nature, and it is done willfully.  The discrimination alleged has been reported to Amazon repeatedly, including by Plaintiffs Wilmuth and Schomer and others during the applicable time period, and Amazon has failed to redress the unlawful pay inequities.

VII.     **CLASS ACTION ALLEGATIONS**

73.     Plaintiffs assert claims under the EPOA on behalf of a proposed class pursuant to Federal Rule of Civil Procedure 23.  Specifically, Plaintiffs seek to represent a class of all women who worked for Amazon in Covered Positions in Washington at any time from three years before the filing of the initial complaint through the resolution of this action (the "EPOA Liability Period" or "Washington Liability Period") (collectively, the "Washington Class").  Plaintiffs are members of the class they seek to represent.

74.     All requirements for class certification are met by the proposed Class.

75.     Numerosity.  Class Members are so numerous that joinder of all members

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 15

Outten & Golden LLP
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1   is impracticable.  Fed. R. Civ. P. 23(a)(1).  Although Plaintiffs do not know the precise number

2   of Class Members, the number is far greater than can be feasibly addressed through joinder.

3           76.    Commonality.  There are questions of law and fact common to the

4   Washington Class, and these questions predominate over any questions affecting only individual

5   members.  Common questions include: (a) whether Amazon maintains common policies and

6   practices with respect to hiring, job assignment, compensation decisions, performance

7   measurement, and promotion decisions, (b) whether Amazon's policies and practices violate the

8   EPOA; (c) whether compensatory damages, punitive damages, monetary equitable remedies,

9   injunctive relief, or other relief is warranted.

10          77.    Typicality.  Plaintiffs' claims are typical of the claims of the Class they

11   seek to represent.

12          78.    Adequacy.  Plaintiffs will fairly and adequately represent and protect the

13   interests of Class Members.  Plaintiffs have retained counsel competent and experienced in

14   complex class actions, employment discrimination litigation, and the intersection thereof.

15          79.    Rule 23(b)(2) certification.  Class certification is appropriate under Rule

16   23(b)(2) because Amazon has acted and/or refused to act on grounds generally applicable to

17   Class Members, making appropriate declaratory and injunctive relief with respect to Plaintiffs

18   and the Class Members they seek to represent.  The Class Members are entitled to injunctive

19   relief to end Amazon's common, uniform, unfair, and discriminatory policies and practices.

20          80.    Predominance and Superiority (Rule 23(b)(3) only).  Class certification

21   under Rule 23(b)(3) is also appropriate because common questions of fact and law predominate

22   over questions affecting only individual Class Members, and because a class action is superior to

23   other available methods for the fair and efficient adjudication of this litigation.  The Class

24   Members have been damaged and are entitled to recovery as a result of Amazon's common,

25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 16

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

uniform, unfair, and discriminatory policies and practices.  Calculation of damages based on

Amazon's computerized data will be more efficiently performed on a classwide than an

individual-by-individual basis.  The propriety and amount of punitive damages will be based on

Amazon's conduct, making these issues common to the Class.

## VIII.   INDIVIDUAL PLAINTIFF FACTUAL ALLEGATIONS

81.     Plaintiffs' experiences, detailed below, both (a) illustrate Amazon's unfair

treatment of women in determining terms and conditions of employment, including in setting

compensation and determining job codes, and (b) support their Individual Claims.

### A.     Background

#### 1.     Plaintiff Caroline Wilmuth

82.     Ms. Wilmuth received a Bachelor's degree from UC Berkeley, a Ph.D.

from Harvard Business School, and research training from UC Berkeley, Stanford, NYU,

Columbia, and Harvard. She has published in some of the best peer-reviewed science journals in

the world, and her research has been profiled by major media outlets such as the New York

Times, Washington Post, BBC, the Today Show, and NPR.

83.     Ms. Wilmuth joined Amazon's Worldwide Communications ("WWC")

Organization in October 2017 as a General Marketing Manager on the Global Employer Brand

team.

84.     In May 2019, Ms. Wilmuth created a research function within Global

Corporate Affairs ("GCA") and became the first researcher within WWC.

85.     Over the next three years, she quickly grew and expanded what became

the GCA Research & Strategy ("R&S") team from just herself to a team of 15 people in

December 2022.

86.     Ms. Wilmuth and her team conducted reputation research on internal and

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 17

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

external audiences that served as the foundation of strategic decisionmaking and resource allocation across WWC, as well as informing Public Policy and Cross-Channel Marketing.

87.     Among other projects, Ms. Wilmuth's team was responsible for global reputation tracking in 18 countries externally and 8 countries internally ("RepTracker"); research and marketing/communications strategy regarding Amazon's reputation in Seattle and the Puget Sound ("HQ1"); exploratory research and messaging development on Amazon's employer reputation, customer trust, sustainability, innovation, executive communications, data privacy, and antitrust; as well as overall reputation strategy.

88.     In recognition of her high-quality work and immense impact on Amazon Worldwide Communications, Ms. Wilmuth won the "One WWC" All-Star award in March 2022.

### 2.     **Plaintiff Erin Combs**

89.     Ms. Combs has 20 years of experience in brand marketing, reputational strategy, and corporate social responsibility roles.

90.     She joined Amazon in March 2020, leading marketing and communications for Amazon in the Community.

91.     In this role, Ms. Combs developed a Headquarters ("HQ") community marketing strategy that built off her experience leading HQ initiatives for Starbucks and Lyft.

92.     In January 2022, Ms. Combs joined the GCA Research & Strategy team led by Plaintiff Wilmuth as a brand and marketing strategist.  She assumed a leadership role and worked with Ms. Wilmuth on team mission, strategy, and expansion.  Ms. Combs also brought the HQ1 work she started on AITC with her to the R&S team and continued leading the HQ1 research and building a HQ1 marketing strategy.

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1

### 3.    **Plaintiff Katherine Schomer**

2         93.    Ms. Schomer has more than 25 years of research experience across many

3 industries, she has 17 publications in peer-reviewed journals, and received multiple national

4 awards and grants.

5         94.    Ms. Schomer joined Amazon in October 2019 as the Head of Market

6 Intelligence for Executive Recruiting.  Ms. Schomer thereafter joined the GCA Research &

7 Strategy team in July 2022.

8         95.    Like Ms. Combs, Ms. Schomer worked alongside Ms. Wilmuth in a

9 strategic leadership role, overseeing the team's highest profile and sensitive exploratory

10 projects (e.g., employee safety, employee satisfaction with communications, treating

11 employees with respect, A-to-z Guarantee, data privacy, and antitrust), as well as all internal

12 research with Amazon employees.

13 **B.**    **Amazon Has Paid Ms. Wilmuth and Ms. Schomer Less than Male**

14     **Researchers Performing the Same or Lesser Work.**

15         96.    Amazon discriminated against Plaintiff Wilmuth by improperly placing

16 her into a lower-paid job code than was appropriate for the work she performed.  During all

17 relevant times, Amazon has coded Ms. Wilmuth as a General Marketing Manager, despite her

18 exclusively performing a research role (building and leading the GCA Research team) since

19 May 2019.

20         97.    Prior to Amazon removing the GCA Research team from her in December

21 2022 (*see* Section VIII.E, ¶¶ 156-168), Ms. Wilmuth was the only researcher on her team not

22 coded in a research job code (and the only person on her team with a Ph.D. coded in a lower

23 compensation job code).

24

25

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

98.    Between 2019 and December 2022, Amazon paid Ms. Wilmuth less than her male peers.  In fact, Amazon paid her less than multiple male colleagues who reported to her.  For example, Amazon paid Ms. Wilmuth less than Jordan Burke, a male team lead reporting to the same supervisor (Christina Lee, VP of Corporate Reputation & Content Strategy), notwithstanding the facts that they ran similar-sized teams (with overlapping subject matter) and that Ms. Wilmuth has a higher level of education and more experience than Mr. Burke (Ms. Wilmuth has a Ph.D. and over five years at Amazon compared to his Bachelor's degree and approximately two years).  Nevertheless, Amazon hired Mr. Burke as an L8 in January 2021, while continuing to pay Ms. Wilmuth as an L7.  Further, Amazon has recognized since at least August 2021 that Ms. Wilmuth was unquestionably performing an L8 role.  For example, Ms. Lee told Ms. Wilmuth to expect to be promoted to L8 in 2022 (an assertion repeated by Drew Herdener, SVP of Global Corporate Affairs in November 2021), but Amazon did not promote her.

99.    Amazon's failure to properly code Ms. Wilmuth's position resulted in Amazon paying two of her male direct reports more than her, despite her working as their manager.  This includes Daniel Tamul (an L6 Research Scientist) from the time he joined the GCA Research Team on July 6, 2020 until Mr. Tamul left the team on December 26, 2021.  Similarly, Amazon paid another male direct report (an L7 Research Scientist, hereafter the "Male Comparator"), more than Ms. Wilmuth during the entirety of his tenure on her team between June and December 2022 (upon information and belief, Amazon paid that Male Comparator approximately $590,000 while paying Ms. Wilmuth – his manager – approximately $400,000).

100.    Even after Amazon stripped Ms. Wilmuth's team from her in December (see Section VIII.E, ¶¶ 156-168), the Male Comparator continued to run the RepTracker

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

program Ms. Wilmuth had originated and run for three years, while Amazon continued to pay him significantly more than Ms. Wilmuth to manage just one of the projects that had been under her purview.

101.    Amazon's failure to properly code Ms. Wilmuth's position has resulted in Amazon underpaying her by hundreds of thousands of dollars annually.  Specifically, Ms. Wilmuth was paid $205,006 in 2019, $279,810 in 2020, and $351,438 in 2021.  But if Ms. Wilmuth had been correctly coded as a researcher then, upon information and belief, she would have been earning between $570,000-$900,000 as an L7 Research Scientist, and between $900,00- $1,300,000 if she were an L8 Research Scientist.

102.    Amazon similarly discriminated against Plaintiff Schomer, improperly coding her position, and paying her less than her male peers.  Prior to joining the GCA Research & Strategy team, Ms. Schomer worked on the Customer Experience and Business Trends ("CXBT" or "Benchmarking") team as a Principal Product Manager.  Ms. Schomer worked side-by-side with her male colleague Pushkar Raj, with both Ms. Schomer and Mr. Raj performing the same job, leading research excellence together, and both possessing the same level of education.  But Amazon coded Mr. Raj as a Research Scientist, rather than Product Manager, and upon information and belief, paid him more than Ms. Schomer despite being a level below her (L6 instead of L7).  When Ms. Schomer questioned her supervisor, Maureen Stewart-Nordberg, about the differing job codes and resulting pay disparity, she received no response.

103.    Amazon continued to pay Ms. Schomer less than her male peers who were at the same level, coded properly, and performing the same work, after she joined the GCA Research & Strategy team.  In July 2022, Ms. Schomer discovered that while she was coded as a "Senior Research Manager" within the Functional Marketing job code, the Male Comparator

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

was coded as a Research Scientist, and therefore she was being compensated significantly less than the Male Comparator.

104.    Ms. Schomer and the Male Comparator were both L7s, performing the same work (research), on the same team, reporting to the same supervisor (Ms. Wilmuth), but their different job codes resulted in Amazon paying the Male Comparator approximately 150% of Ms. Schomer's salary.

105.    Upon information and belief, the highest compensation in Ms. Schomer's then job code range (Functional Marketing) is approximately $367,000, while the Research Scientist job code has a minimum compensation of $570,000 and tops out at approximately $900,000.

106.    With a Master's degree, 25+ years of research experience, and 17 research publications, Ms. Schomer more than meets the general qualifications for the higher-paid Research Scientist position.

107.    While both Ms. Wilmuth and Ms. Schomer indisputably perform research roles and have the requisite degree and/or years of experience for the Research Scientist role, Amazon has discriminated against both by improperly coding their roles commensurate with their prior unrelated positions at Amazon and paying them less than their male peers and/or subordinate.

108.    Amazon has continued to underpay Plaintiffs Wilmuth and Schomer after they (and several other women) brought the pay disparity to Amazon's attention.  Amazon's knowledge of the pay disparity and failure to remedy it was willful.

109.    Upon information and belief, Amazon was also paying Ms. Combs less than her male peers.  Ms. Combs was paid at the very low end of the pay band for her role and level, while males who had the same job code at the same level were being paid more, including

males who had substantially less experience than Ms. Combs, including but not limited to Dylan Green.

## C.   Amazon Has Subjected Ms. Wilmuth and Ms. Combs to Inferior Treatment Based on Their Gender.

110.   Both Ms. Wilmuth and Ms. Combs have experienced discriminatory treatment at the hands of Jordan Burke, an L8 Director who reports to Ms. Wilmuth's former supervisor, Vice President Christina Lee.

111.   Given the overlap between the reputation research conducted by Ms. Wilmuth's former team and Mr. Burke's paid advertising campaigns team, both Ms. Wilmuth and Ms. Combs regularly had to work with Mr. Burke, and both experienced similarly gender-based mistreatment from him.  This includes Mr. Burke devaluing and questioning their experience and expertise, undermining and marginalizing their work and contributions, and speaking to them in in an unprofessional, disrespectful, condescending, and patronizing manner.

112.   Beginning in July 2022, Mr. Burke started taking credit for Plaintiffs Wilmuth's and Combs' work.  For example, Ms. Wilmuth's and Mr. Burke's teams prepared a joint paper sharing the findings of career advancement research that had been conducted by their two teams.  After the paper had been finalized, Mr. Burke removed Ms. Combs' name and that of the GCA Research & Strategy team, and then circulated the joint paper to a wide group of Amazon stakeholders with only his team listed, deliberately concealing the contributions of Ms. Wilmuth's team.  Plaintiffs are not aware of any instance Mr. Burke taking credit for male peers' work.  To the contrary, Mr. Burke often selects Dan Scarvalone, Dylan Green and Robert Wilson to present their work to leadership, Ms. Lee included.  Mr. Burke routinely highlights successful accomplishments from men on his team, including Mr. Wilson, Joshua Werman, Benjamin Herson, Mr. Green, and Mr. Scarvalone.

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

113.     During a meeting the following month, when Ms. Lee asked Mr. Burke for an example of local reputation work he had done at Uber (where he worked prior to Amazon), he cited a program that was neither his nor Uber's - instead, it was a program that Ms. Combs had led for Lyft (Uber's primary competitor and her employer prior to Amazon).

114.     Last fall, after Ms. Combs had successfully presented her HQ1 reputation research and marketing strategy, Mr. Burke began to assert ownership for the work Ms. Combs had originated and spent the last two years building at Amazon (after spending much of her career doing the same for prior companies).

115.     Despite the fact that Ms. Combs is indisputably a subject matter expert in this area and there would be no HQ1 marketing work at Amazon but for her leadership, Mr. Burke insisted that a man reporting to him, Rob Wilson, should own all HQ1 creative development going forward and told Ms. Combs that she could apply for an L6 role reporting to Mr. Wilson if she wished to continue working on the program she built.

116.     During a meeting about this work on September 22, 2022, Mr. Burke and Mr. Wilson repeatedly talked over and down to Ms. Combs in an insulting manner, even though she has more than 20 years of experience in creative marketing and has spent the last 10 years leading creative teams or agencies, which is greater experience than either Mr. Burke or Mr. Wilson.  While Ms. Combs observed Mr. Burke and Mr. Wilson speak to other women on the team in a similar manner, on information and belief, they did not speak to their male colleagues this way.

117.     Plaintiffs Wilmuth and Combs also both saw their roles and responsibilities materially diminished in favor of enhancing Mr. Burke and his team.  For example, while Mr. Burke has no formal research training or education, and significantly less experience than either Ms. Wilmuth or Ms. Combs, Amazon enabled him to take over large

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 24

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1    portions of their research and marketing strategy work.

2           118.    Multiple other women who work with Mr. Burke have also raised

3    concerns in the last year that he treats them differently because of their gender and/or race.  This

4    includes Mr. Burke elevating men to leadership roles, whereas women with greater experience

5    are passed over or shuffled down.  For example, there were four female L7s (including Ms.

6    Combs prior to her constructive discharge) nested under Dylan Green, a male L7 who reports up

7    to Mr. Burke, even though each of these women have more experience than the higher-paid Mr.

8    Green.

9           119.    Women on Mr. Burke's team have also reported having their expertise

10   minimized and their feedback ignored, being excluded from work that they own, and having less

11   access and opportunities to interface with Mr. Burke, as he meets more frequently with male

12   employees on his team than with female employees.

13          120.    Upon information and belief, the pay inequities that were experienced by

14   female researchers under Ms. Wilmuth still exist today under Mr. Burke, despite Ms. Wilmuth's

15   efforts to remedy them.

16          121.    At least two of the women who complained about Mr. Burke's treatment

17   this year, Allison Heim and Kendra Tappin, have since been separated from Amazon.

18          122.    Defendant is liable for Mr. Burke's disparate treatment of Plaintiffs

19   Wilmuth and Combs because they (and others) complained to their managers and HR, but

20   Amazon failed to take reasonably prompt and adequate corrective action.

21   **D.**     **Plaintiffs Have Repeatedly Raised Concerns About Gender Discrimination,**

22           **But Amazon Has Failed to Remedy the Problems.**

23           **1.**     **Plaintiff Caroline Wilmuth**

24          123.    Ms. Wilmuth began surfacing concerns regarding her pay and Mr. Burke's

25

treatment in November 2021.  During a one-on-one conversation with her direct supervisor, Ms. Lee, Ms. Wilmuth asked about being moved to a Research Scientist job code, as Amazon had not updated her job code and compensation since she left her prior marketing role and began leading the GCA Research & Strategy team in May 2019.

124.    During that same conversation, Ms. Wilmuth raised concerns about Mr. Burke treating her with a lack of respect and told Ms. Lee that she had tried to address these concerns with Mr. Burke directly on multiple occasions, but the mistreatment had continued unabated.  In response to her concerns, Ms. Lee told Ms. Wilmuth that she (Ms. Lee) used to cry almost every day in her first year at Amazon because of how she was treated, but that is just the way Amazon is, and Ms. Wilmuth needed to learn to live with it.

125.    Ms. Lee also stated, "maybe somebody else should run the GCA Research & Strategy team."  Ms. Wilmuth understood this as a threat to remove the team she had founded, and spent the last several years building, if she continued to raise concerns about her pay or Mr. Burke's mistreatment.

126.    The following week, in their next one-on-one, Ms. Lee told Ms. Wilmuth that she was not ready to be promoted to Director based on Amazon's metrics, and cited Ms. Wilmuth having raised concerns about Mr. Burke's mistreatment as an example of her "professional immaturity" and "poor stakeholder management skills."  Ms. Lee went on to assign Ms. Wilmuth an executive coach.

127.    Six months later, in May 2022, Ms. Wilmuth again spoke with Ms. Lee regarding her compensation.  Ms. Lee told Ms. Wilmuth that her compensation would be increased as part of a Q3 promotion to L8 Director.  Documentation shows that as of early July, Ms. Lee was actively working on Ms. Wilmuth's promotion.

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

128.     Then on July 12th, 2022, Ms. Wilmuth again raised with Ms. Lee her strong concerns about Mr. Burke's treatment of herself and female members of her team, including Ms. Combs and Lauren Ennis, an L6 Senior Program Manager.  Ms. Wilmuth detailed multiple instances where Mr. Burke had spoken to her in a condescending manner, minimized or dismissed the work of her team, and took credit for shared work product.

129.     Two days later, on July 14, 2022, Ms. Lee informed Ms. Wilmuth that her promotion and compensation increase were being put on hold, purportedly because two of Ms. Wilmuth's subordinates with documented performance issues had raised concerns that she was "too controlling" in managing her team.  Ms. Lee pointed to the Leadership Principles "Hire & Develop the Best," "Earn Trust," and "Invent and Simplify" as areas that Ms. Wilmuth needed to work on, despite having never been provided that feedback prior to her raising concerns.

130.     Ms. Wilmuth began escalating her concerns about gender-based treatment and retaliation up through her management chain and to HR.  On September 13, 2022, Ms. Wilmuth told her skip-level supervisor, Senior Vice President Drew Herdener, that she was being held to a different standard as a woman and criticized as a female leader for being too aggressive.  The following week, Ms. Wilmuth similarly reported to Chuin Phang, Senior DEI Specialist in HR, that she felt the way she was being treated by Mr. Burke and Ms. Lee was both gendered and retaliatory.

131.     Upon information and belief, Ms. Lee has engaged in other discriminatorily biased activity, including by asking a subordinate what skills they had to justify their green card status in front of their colleagues.

132.     Ms. Wilmuth continued to engage in protected activity throughout the fall, raising and/or escalating the concerns of her female subordinates about gender-based pay discrimination and disparate treatment.  In October, Ms. Wilmuth escalated concerns Plaintiff

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1  Schomer had surfaced about the substantial pay discrepancies between the Functional Marketing

2  and Research Scientist roles on her team, which were held by researchers performing the same or

3  substantially equal work.

4         133.    Ms. Wilmuth expressed her shared concern about "the gender and racial

5  divides . . . across the compensation levels and job categories on [her] team."  Ms. Wilmuth also

6  pointed out that she herself was a victim of the disparate compensation Amazon was paying male

7  researchers on her team as compared to female researchers.

8         134.    At the time, there were four L7 researchers on Ms. Wilmuth's team:

9  herself, Ms. Schomer, the Male Comparator, and Roxana Cosmaciuc.  All three female

10 researchers were coded in lower-paid marketing job codes, while the only male researcher was

11 coded in the higher-paid Research Scientist job code.

12        135.    Ms. Lee responded to Ms. Wilmuth's concerns, admitting there had "been

13 a slow evolution" in Amazon "matching the appropriate classifications."  Notably, Ms. Wilmuth

14 had been in a researcher role for over two and a half years at this point, and all of the individuals

15 on her team had been in researcher roles since they started at Amazon.

16        136.    On November 2, 2022, Ms. Wilmuth spoke to Ms. Lee and HR Business

17 Partner ("HRBP") Keith Johnson regarding the pay discrimination concerns raised by her and

18 members of her team.  During that conversation, Ms. Lee declared there had "been a lot of these

19 kinds of claims coming from [Ms. Wilmuth's] team."  She and Mr. Johnson then proceeded to

20 aggressively question Ms. Wilmuth about what conversations *she* was having with her team that

21 were "leading" them to surface discrimination concerns.

22        137.    Mr. Johnson then declared that Amazon would not provide back pay for

23 any of the lower-paid female researchers and it was unlikely Amazon would increase their

24 compensation to pay them equally to their higher-compensated male research peers.

25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 28

138.     That same week, Ms. Wilmuth submitted a written complaint to HR, describing how she had been subject to gender discrimination with respect to her compensation, the diminution of her role and responsibilities, and the treatment she had endured from Mr. Burke.

139.     When Ms. Wilmuth informed Amazon that she had filed an EEO complaint involving Mr. Burke and Ms. Lee, her skip-level manager Mr. Herdener dismissed and minimized Ms. Wilmuth's concerns as nothing more than a "personality clash."

## 2.     **Plaintiff Erin Combs**

140.     Ms. Combs began voicing concerns about Mr. Burke's disparate treatment to Ms. Wilmuth in July 2022.  Ms. Wilmuth in turn escalated Ms. Combs' concerns, as well as her own, to Ms. Lee.

141.     In early August 2022, Ms. Combs shared her concerns directly with Ms. Lee, reporting she had never in her professional career seen a leader speak to team members in the "alarming and offensive" way that Mr. Burke had spoken to Ms. Wilmuth, Ms. Combs, and Lauren Ennis during a meeting in July 2022.

142.     Throughout August and September, Mr. Burke continued to claim credit for Ms. Combs' work, while also sending emails to Ms. Combs' supervisors referring to her as uncollaborative, "presumptuous," and "strident."  On September 20, 2022, Ms. Lee told Ms. Combs that Mr. Burke's emails were "inappropriate," and she would speak to him about it.  Ms. Lee also assured Ms. Combs that she would continue to own her HQ1 work.

143.     Nevertheless, Mr. Burke's disrespectful treatment and efforts to assume control of Ms. Combs' work continued unabated.  On September 26, Ms. Combs told Mr. Burke that his recent comments were disrespectful and insulting.  In response, Mr. Burke stated that a male on his team, Rob Wilson, would soon own Ms. Combs' HQ1 work, and she "could apply

1  for an open role reporting to Rob" (notably, the open role was an L6 position, lower than the L7

2  role Ms. Combs was currently performing.)

3          144.    A couple days later, Ms. Combs escalated her concerns to HR.  She

4  detailed her concerns regarding Mr. Burke's "unprofessional, unethical, and unequal" treatment

5  on September 30, 2022.  Ms. Combs expressed her fear about working with (or worse, under)

6  Mr. Burke, and stated she did not feel she was in a safe environment to file a formal complaint

7  because she feared retribution.

8          145.    Ms. Combs continued raising her concerns with Ms. Wilmuth throughout

9  the fall, explicitly calling out Mr. Burke's treatment of her as "gendered," and telling Ms.

10  Wilmuth that she found "him to be deeply misogynistic," and that he speaks to and interacts with

11  male leaders in a different manner than female leaders.  She stated: "I can't even imagine him

12  treating a man the way he treats me."

13          146.    Ms. Combs again escalated her concerns to Ms. Lee on November 10,

14  reporting that Mr. Burke continued to marginalize her and was trying to assume ownership of her

15  HQ1 work.

16          147.    By this point, Ms. Wilmuth had filed her own discrimination complaint

17  related to Mr. Burke's treatment of her and Ms. Combs.  On November 17, 2022, Ms. Combs

18  was contacted by Employee Relations as part of the investigation into Ms. Wilmuth's EEO

19  complaint.  Over the course of two interviews and follow up emails in late November, Ms.

20  Combs provided documentation of Mr. Burke's mistreatment.

21          148.    Notably, the investigator did not ask Ms. Combs if she believed Mr.

22  Burke's treatment was discriminatory or related to gender (instead asking only about "tension"

23  between Ms. Wilmuth's and Mr. Burke's teams).

24

25

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1

### 3.   Plaintiff Katherine Schomer

2    149.    Ms. Schomer first began raising concerns about pay inequity with Ms.

3   Wilmuth within weeks of joining the R&S team in July 2022, and discovering that the Male

4   Comparator was coded as a Research Scientist, while Ms. Schomer is not.

5    150.    Approximately three weeks later, when a Black female colleague joined

6   Ms. Schomer's team, also in the lower-paid Functional Marketing job code, she similarly

7   expressed that the pay differentials were inequitable given that Ms. Schomer's and the Male

8   Comparator's teams both performed the same work (research).

9    151.    At Ms. Wilmuth's suggestion, Ms. Schomer met with Amazon Director

10   Katie Curran, who had been investigating job codes within WWC.  On September 21, 2022, Ms.

11   Schomer explained to Ms. Curran how current job codes were creating significant pay

12   discrepancies on Ms. Wilmuth's team, and the impact was being felt across gender and racial

13   lines.

14    152.    During her next two one-on-ones with Ms. Wilmuth in late September and

15   then October 5, 2022, Ms. Schomer continued to raise strong concerns about unequal pay based

16   on gender and race.  Ms. Schomer followed up with an email to Ms. Curran and Ms. Wilmuth on

17   October 7 summarizing the compensation issues they had discussed and the need for a job code

18   and compensation review for Ms. Wilmuth's team.

19    153.    Ms. Schomer's concerns worsened when she hired a Black researcher on

20   her team in early November, who Ms. Lee and HR wrongfully insisted be placed in a lower-paid

21   job code.  Further, with this hire, Ms. Schomer now had three people reporting to her, which

22   should have automatically elevated her into the higher-paying Senior Manager title.

23    154.    Ms. Schomer raised this with Ms. Wilmuth on November 18, as she was

24   still being paid as a "Principal" instead of the proper title of "Senior Manager," further impacting

25

her compensation.  Ms. Wilmuth emailed HRBP Keith Johnson that same day seeking guidance on how to make this change to ensure Ms. Schomer was "appropriately recognized and compensated" for the people leadership role that she was then performing.

155.    After Ms. Schomer again discussed her pay discrimination concerns with Ms. Wilmuth on December 5, Ms. Wilmuth again escalated the issue of Ms. Schomer's pay raise.  Mr. Johnson refused to provide the requested information and insisted that Ms. Schomer not be compensated as a senior manager until after the completion of a job code analysis, thus continuing the pay disparity between Ms. Schomer and the Male Comparator.

E.    **Amazon Retaliated Against Plaintiffs by Demoting Them Within Weeks of Each Engaging in Protected Activity.**

156.    On December 12, 2022, Ms. Lee informed Ms. Wilmuth that Amazon was removing her entire 15-person team and all of her projects from under her purview, and she would no longer have any role on the GCA Research and Strategy team (that she founded and spent three and a half years building).

157.    Amazon demoted Ms. Wilmuth from a People Manager to an Individual Contributor and moved her from a leadership role (that was scoped as an L8 Director) to a supporting researcher role on the AITC Fundamentals team with no opportunity for advancement.

158.    At the same time, Ms. Lee also told Ms. Wilmuth she would no longer have any role in assessing the appropriate job codes for herself, Ms. Schomer, and the other female researchers on her team, despite Ms. Wilmuth having raised concerns concerning discriminatory assignments of job codes to Ms. Lee and to HR.

159.    Three days later, on December 15, 2022 (the "December 15th Reorg"), Ms. Wilmuth discovered that her entire team was moved under Mr. Burke (the very man she and

Plaintiff Combs had been complaining was discriminating against them).

160. Amazon's disparate treatment of Ms. Wilmuth compared to Mr. Burke is stark: while her promotion to L8 Director in the summer of 2022 was put on hold because of concerns regarding her "communication and management style" (before Amazon demoted her), Amazon greatly expanded Mr. Burke's role and team in December 2022 while he was being actively investigated for gender discrimination against multiple female leaders.

161. Indeed, even after the reorganization, Mr. Burke's discriminatory behavior has continued: Mr. Burke met more frequently with the male members of his team and provided them with greater opportunities that female leaders, including Plaintiffs Schomer and Combs, were not provided.

162. When Amazon moved Ms. Wilmuth's team under Mr. Burke, it also removed 10 of Plaintiff Schomer's 11 projects and two of her three team members. With the removal of Ms. Schomer's direct reports in late December, she also became ineligible for the higher-paying Senior Manager job code, which should have automatically taken effect back in November.

163. In addition to losing two-thirds of her staff and 90 percent of her projects, Amazon required Ms. Schomer to report to a peer on Mr. Burke's team with less than half her years of experience (approximately 12 years of experience compared to Ms. Schomer's 25+ years).

164. Like Plaintiffs Wilmuth and Schomer, Amazon also removed Ms. Combs from her leadership position, stripped both of her direct reports from her (thus demoting her from a People Manager to an Individual Contributor), and reduced the scope of her role by approximately 75 percent.

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

165.     Among the projects Ms. Combs lost were RepTracker (the team's largest and highest-priority project for which she had served as the strategic lead and wrote the Q4 document); executive research (a highly sensitive and visible body of work on CEO and executive communications); and brand messaging (a body of work Ms. Combs had conceived and led for more than a year).

166.     Amazon also began requiring Ms. Combs to report to Dylan Green, a man with substantially less experience (approximately 12 years of experience compared to Ms. Combs' 20+ years).   The two reports Ms. Combs lost similarly were moved under a less qualified male on Mr. Burke's team.

167.     Amazon's demotion of Ms. Combs and reorganization of her supervisors resulted in Amazon layering supervisors over her position: instead of one supervisor between her and the Vice President-level there were now three, effectively eliminating any path to L8 promotion.

168.     In sum, Amazon removed Plaintiffs Wilmuth, Schomer, and Combs from their leadership roles, stripped their direct reports from them, removed the majority of their remits, and severely diminished their career paths after they repeatedly raised concerns about gender and pay discrimination.

**F.**     **Amazon Failed to Take Any Corrective Action in Response to Plaintiffs' Complaints.**

169.     On December 20, 2022, Ms. Combs spoke with the Employee Relations Investigator assigned to Ms. Wilmuth's gender discrimination and retaliation complaint.  Ms. Combs told the Investigator that she believed Mr. Burke's treatment was gender discrimination, and that her demotion as part of the December 15th Reorg was both discriminatory and in retaliation for her earlier concerns about Mr. Burke's discrimination.

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 34

Outten & Golden LLP
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

170.     Three days later, on December 23, Ms. Combs submitted a written complaint calling out how the "reorg" disproportionately affected the female members of the Research & Strategy leadership team.  Of the four L7 leads who had reported to Ms. Wilmuth, each of the three women (Ms. Combs, Ms. Schomer, and Ms. Cosmaciuc) lost direct reports, lost their leadership roles, and had their scopes severely reduced, while the only male L7 (the Male Comparator) had his role, team, and compensation remain the same or even increased.

171.     On January 4, 2023, Plaintiff Schomer also filed a formal complaint regarding Amazon's pay discrimination and her retaliatory demotion.  Ms. Schomer detailed Amazon's disparate treatment of her as compared to the Male Comparator, both with respect to their compensation and their treatment in the "reorg."  (The Male Comparator gained a direct report in the "reorg," resulting in him receiving the Senior Manager pay increase, while also keeping his entire remit intact.)

172.     On January 11, 2023, Amazon informed Ms. Wilmuth that their investigation had found "zero trace of gendered treatment."  With respect to Ms. Wilmuth's pay discrimination claim, the investigator admitted that she had done nothing to determine whether Ms. Wilmuth was improperly coded in a marketing job code while performing the work of a researcher, stating: "it's not my job to make an assessment of your role."  Nevertheless, she found that Ms. Wilmuth could not compare her pay to the Male Comparator's *precisely because* she is coded as a Marketer and he was coded at a Research Scientist (i.e., the entire basis for Ms. Wilmuth's claim).

173.     On February 1, the investigator assigned to Ms. Wilmuth's and Ms. Combs' discrimination and retaliation claims interviewed Ms. Schomer and Roxana Cosmaciuc. Both women stated the "reorg" was absolutely gendered and negatively and disproportionately impacted the female L7 leaders on the Research and Strategy team with the apparent intent to

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

avoid addressing the pay inequity (Ms. Schomer also reported that the "reorg" was retaliatory.)

174.    Upon information and belief, when the Male Comparator was interviewed, he similarly told the investigator that he believed the "reorg" disproportionately harmed women, and specifically stated that Plaintiffs Combs and Schomer, and Ms. Cosmaciuc were all forced to report to people with less experience, while he gained a direct report in the December 15th Reorg.

175.    After Plaintiff Combs continued raising concerns about Mr. Burke's gender-based treatment and the discriminatory and retaliatory nature of the "reorg," Mr. Burke further diminished her role.  In late January, Mr. Burke removed her from RepTracker, despite Ms. Combs having been the document owner, primary drafter, and strategy lead.  Two weeks later, Mr. Burke directed Ms. Combs to cease work on her Brand Messaging project, purportedly because it was not a priority.  But then on February 9, Mr. Burke assigned a less qualified male Rob Wilson (the same individual Mr. Burke previously said would own Ms. Combs' HQ1 work) to also take over her Brand Messaging project.

176.    On March 1, 2023, Amazon's EEO investigator admitted that, with respect to moving Ms. Wilmuth's team under Mr. Burke's, "on its face, it seems like there was a disparate impact" on women and referenced the "optics of disparate impact" multiple times.  By that point, at least five employees had raised concerns the "reorg" was "gendered" and "discriminatory," (Plaintiffs Wilmuth, Schomer, Combs, and Ms. Cosmaciuc, and the Male Comparator), and Amazon's own investigator admitted the "optics of disparate treatment."

G.    **Amazon Continues to Discriminate and Retaliate Against Plaintiffs.**

177.    As a result of Amazon's unlawful conduct, Plaintiffs' mental and physical health suffered, and each applied for and took a medical leave of absence under the Washington and Federal Family and Medical Leave Acts (together, "FMLA").  Ms. Wilmuth, Ms. Schomer,

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 36

Outten & Golden LLP
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1    and Ms. Combs were eligible for FMLA leave at the time they availed themselves of their leaves,

2    and each of these leaves were properly approved under both Amazon policy and the applicable

3    laws.  Ms. Wilmuth took FMLA medical leave between March 16, 2023 and June 14, 2023; Ms.

4    Combs took FMLA medical leave between March 20 and June 11, 2023 and short-term disability

5    between June 12 and July 18, 2023; and Ms. Schomer took FMLA medical leave between May

6    5th and August 2, 2023.

7            178.    Since returning from their respective medical leaves, Amazon has

8    continued to discriminate and retaliate against each of the Plaintiffs.

9                            1.    **Plaintiff Caroline Wilmuth**

10           179.    Upon Ms. Wilmuth's return to work from FMLA leave, Amazon HR

11   shared information concerning her confidential EEO complaints with one of Ms. Wilmuth's co-

12   workers.  Specifically, Ms. Wilmuth was informed that before she joined AITC (following the

13   removal of her team) HRBP Keith Johnson told Kailey Waring, Marketing Lead, "a new person

14   is joining your team from a troubled situation" and "Amazon has the receipts on her."  Another

15   teammate told Ms. Wilmuth that Ms. Waring shared this information with other Amazon

16   employees, further damaging her reputation.

17           180.    Upon information and belief, while Ms. Wilmuth was out on FMLA leave,

18   individuals on the team made comments such as, "If I was her, I wouldn't come back from

19   leave."

20           181.    On Tuesday, October 3, 2023, Ms. Wilmuth submitted a claim to

21   EthicsPoint detailing this information, and then emailed a summary to Tara Lubbers, Head of the

22   AITC Fundamentals team.  Amazon has done nothing with respect to Ms. Wilmuth's complaint.

23           182.    On December 25, 2024, Ms. Wilmuth went out on short-term disability

24   leave, duly approved by Amazon.  On January 10, 2024, during Ms. Wilmuth's disability leave,

25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 37

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1  she was called into a meeting with Ms. Lubbers and HRBP Christopher Royle.  They informed

2  Ms. Wilmuth that Amazon was terminating her employment due to role elimination.

3          183.    Just prior to her disability leave, Ms. Lubbers had asked Ms. Wilmuth to

4  write a job description for her role.  Upon information and belief, Ms. Lubbers asked her to

5  prepare this so it could be used as a job vacancy announcement to be posted for her own

6  position, should Ms. Wilmuth opt to leave Amazon at some point.

7          184.    Upon information and belief, Amazon fired Ms. Wilmuth in retaliation for

8  her many complaints of discrimination and retaliation, including by filing this lawsuit a month

9  prior, and for taking medical leave.

10                  **2.      <u>Plaintiff Katherine Schomer</u>**

11          185.    In December 2022, Ms. Wilmuth entered a "top tier" performance rating

12  for Ms. Schomer.  By the time Ms. Schomer received her annual performance review in March

13  2023, however, her new supervisor Ana Rocca, had downgraded her to "meets expectations,"

14  despite having only supervised her for two weeks of the applicable review period.  This resulted

15  in a significant loss of stock compensation and will negatively impact Ms. Schomer's

16  compensation level for the next three years.

17          186.    When Ms. Schomer asked why Ms. Rocca had rejected Ms. Wilmuth's

18  rating, Ms. Rocca told her they could not "talk" to Ms. Wilmuth, but they had spoken to Ms.

19  Schomer's previous manager, Maureen Stewart-Nordberg, who is no longer at Amazon.  Ms.

20  Schomer complained to Employee Relations that this review process had not followed standard

21  Amazon protocol.  Amazon took no action in response to Ms. Schomer's complaint.  This lower

22  rating also affects Ms. Schomer's reputation at Amazon and impacts her ability to find another

23  role at Amazon.

24

25

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

187.    Within weeks of returning from FMLA leave, Ms. Schomer began experiencing additional retaliatory treatment.  After Ms. Rocca had only been supervising Ms. Schomer for two weeks following her return, she provided Ms. Schomer with a list of purported performance issues that she had never previously mentioned, and notably came on the heels of Ms. Schomer's complaints and her protected FMLA leave.

188.    Ms. Schomer reported this retaliatory action to HR and Employee Relations.  Ms. Rocca falsely reported to Employee Relations that she had conveyed the performance issues prior to Ms. Schomer's FMLA leave.

189.    In late November, days after filing this lawsuit, Ms. Schomer learned that Amazon had placed her in Focus, an internal performance management program.  Upon information and belief, this precludes Ms. Schomer from transferring to another team or role, and will result in a low performance rating, negatively impacting Ms. Schomer's compensation.

190.    On February 2, 2024, approximately two months after the filing of the instant lawsuit, Amazon further placed Ms. Schomer into Pivot, which Amazon' equivalent of a Performance Improvement Plan.

### 3.    Plaintiff Erin Combs

191.    In December 2022, Ms. Wilmuth entered a "top tier" performance rating for Ms. Combs.  By the time Ms. Combs received her review in March 2023, however, Amazon had downgraded her to "meets expectations."  This resulted in a significant loss of stock compensation which would have negatively impacted Ms. Combs' compensation for the next three years.

192.    In the written review, Amazon failed to give Ms. Combs credit for a majority of the work she completed in 2022, including her brand messaging and marketing strategy projects, as well as her leadership and people management contributions.

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 39

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

193.    Further, several peers and direct reports identified "delivers results" as one of Ms. Combs' strengths, however, Mr. Green identified "deliver results" as a growth area and wrote "while Erin spent most of 2022 developing the strategy for HQ1 marketing, she has not yet been able to deliver significant business/reputational impact for this work."  This is empirically false.  Drew Herdener, SVP of Worldwide Communications, had approved two of Ms. Combs' strategy proposals in 2022 and, only a few weeks before her review was finalized in 2023, approved $13 million to fully fund the HQ1 strategy she developed.

194.    When Ms. Combs returned from FMLA and short-term disability leave on July 19, 2023, Amazon failed to reinstate her to her pre-leave role (which was already a demotion from her pre-December 2022 role).  Instead, Amazon further demoted Ms. Combs and placed her in a role in which she is set up to fail.

195.    Specifically, Amazon directed Ms. Combs to perform work previously led by an L6 researcher, which is both below her level and outside Mr. Combs' skillset, as she has no background in technical research or methodology.  Ms. Combs requested training and coaching on this research tool, and told her managers that she was not comfortable leading tests in it, but her managers ignored these requests, and then blamed Ms. Combs for any small and insignificant misstep.

196.    When she was out on FMLA leave, Amazon had transferred Ms. Combs' HQ1 work to two individuals who do not have the subject matter expertise of Ms. Combs.

197.    In addition to this project, Ms. Combs was assigned to two other projects following her return from FMLA leave.  The first of these projects was duplicative of the work of other team members, as Ms. Combs expressed to her supervisor, and further her supervisors communicated to her that the project lacked funding for 2024, indicating that the project was low priority and unlikely to materialize in the future.  The second project Ms. Combs was assigned

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 40

Outten & Golden LLP
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

did not carry any tasks, as the work had been completed by others while she was on FMLA leave.

198.    Upon information and belief, Mr. Burke, Ms. Rocca, and Mr. Green told individuals on the team that they were not expecting Ms. Combs to return to the team or Amazon, and that the individual filling Ms. Combs' role while she was on medical leave would permanently replace Ms. Combs.

199.    After returning from FMLA leave, Ms. Combs' supervisor Mr. Burke ignored her, and communicated directly with her only once during a span of over four months.

200.    Ms. Combs complained numerous times to her supervisors regarding her project assignments, including their lack of future viability and priority.

201.    In November 2023, Ms. Combs' supervisors conveyed unfounded and negative feedback about the project on which she was working.

202.    As a direct result of Amazon's retaliatory demotion, limited assignment of projects that had no funding or future viability, and lack of opportunity to grow her career at Amazon, Ms. Combs was compelled to resign, effective December 2, 2023.

203.    To date, Amazon has not corrected the above-described pay disparities or returned any of the Plaintiffs to their prior roles.  Amazon's actions were and are willful and malicious.

204.    Amazon's discrimination and retaliation was intended to cause, and did cause, each of the Plaintiffs severe emotional distress, anxiety, humiliation, and loss of enjoyment of life.

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1

IX.    **CAUSES OF ACTION**

2

<u>**FIRST CLAIM**</u>

3

**VIOLATIONS OF WASHINGTON EQUAL PAY AND OPPORTUNITIES ACT,**

4

**RCW 49.58.010 ET SEQ.**

5

**(on behalf of Plaintiffs and the Washington Class)**

6

205.    Plaintiffs Wilmuth, Schomer, Combs, and the Washington Class

7

incorporate by reference paragraphs 1 through 204 above.

8

206.    This claim is brought by Plaintiffs on behalf of themselves and the

9

Washington Class.

10

207.    Pursuant to the Washington Equal Pay and Opportunities Act, RCW 49.58

11

*et seq.*, it is unlawful for an employer to discriminate in any way by providing compensation

12

based on gender.

13

208.    Amazon has paid Plaintiffs and the Washington Class less than similar

14

male employees for the performance of work requiring similar skill, effort, and responsibility,

15

and performed under similar working conditions.

16

209.    Amazon's conduct constitutes gender discrimination with respect to

17

compensation in violation of the Washington Equal Pay and Opportunities Act.

18

<u>**SECOND CLAIM**</u>

19

**VIOLATIONS OF EQUAL PAY ACT, 29 U.S.C. § 206 *et seq.***

20

**(on behalf of Plaintiffs and the Collective)**

21

210.    Plaintiffs Wilmuth, Schomer, Combs, and the Collective incorporate by

22

reference paragraphs 1 through 209 above.

23

211.    This claim is brought by Plaintiffs on behalf of themselves and the

24

Collective.

25

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

212.     Defendant discriminated against Plaintiffs Wilmuth, Schomer, Combs and the Collective in violation of the EPA, 29 U.S.C. § 206 *et seq.*, by paying them less than their male comparators who performed equal work requiring equal skill, effort, and responsibility, and which was performed under similar working conditions.

213.     The EPA makes it unlawful for an employer to discriminate between employees on the basis of sex by paying wages to employees at a rate less than the rate paid to employees of the opposite sex for equal work.

214.     Amazon subjected Plaintiffs and the Collective to discriminatory leveling and compensation policies that resulted in the underpayment of salary, bonuses, and equity awards to Plaintiffs and the Collective in violation of the EPA.

215.     Amazon caused and contributed to the underpayment of Plaintiffs and the Collective relative to their male comparators who were performing substantially equal work.

216.     As a result of Amazon's conduct, Plaintiffs and the Collective suffered harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

217.     The foregoing conduct, as alleged, constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).

## THIRD CLAIM

**RETALIATION IN VIOLATION OF THE EQUAL PAY ACT, 29 U.S.C. § 206 *et seq.***

**(on behalf of Plaintiffs Wilmuth and Schomer individually)**

218.     Plaintiffs Wilmuth and Schomer incorporate by reference paragraphs 1 through 217 above.

219.     Defendant retaliated against Plaintiffs Wilmuth and Schomer by demoting them, and firing Ms. Wilmuth, for engaging in protected activity, in violation of 29 U.S.C. § 206

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

*et seq.*

220.    As a result of Amazon's conduct, Plaintiffs suffered harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

221.    The foregoing conduct, as alleged, constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).

## FOURTH CLAIM

### RETALIATION IN VIOLATION OF THE WASHINGTON EQUAL PAY AND OPPORTUNITIES ACT, RCW 49.58.010 ET SEQ.

**(on behalf of Plaintiffs Wilmuth and Schomer individually)**

222.    Plaintiffs Wilmuth and Schomer incorporate by reference paragraphs 1 through 221 above.

223.    Plaintiffs Wilmuth and Schomer each engaged in protected opposition to what they believed in good faith to be unlawful discrimination against them.

224.    Defendant retaliated against Plaintiffs Wilmuth and Schomer by demoting them, and firing Ms. Wilmuth, for engaging in protected activity, in violation of RCW 49.58.050.

## FIFTH CLAIM

### DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF THE WASHINGTON LAW AGAINST DISCRIMINATION, RCW 49.60.030(1)

**(on behalf of Plaintiffs Wilmuth, Schomer, and Combs individually)**

225.    Plaintiffs Wilmuth, Schomer, and Combs incorporate by reference paragraphs 1 through 224 above.

226.    This claim is brought by Plaintiffs on behalf of themselves individually.

227.    Plaintiffs Wilmuth, Schomer, and Combs belong in a protected class on

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 44

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1   the basis of sex (female).

2   228.   Plaintiffs Wilmuth, Schomer, and Combs were discriminated against on

3   the basis of gender and compensation and treated less favorably in the terms or conditions of

4   their employment than similarly situated male employees.

5   229.   Defendant substantively demoted Plaintiffs Wilmuth, Schomer, and

6   Combs on the basis of their gender.

7   **SIXTH CLAIM**

8   **RETALIATION IN VIOLATION OF THE WASHINGTON LAW AGAINST**

9   **DISCRIMINATION, RCW 49.60.210(1)**

10  **(on behalf of Plaintiffs Wilmuth, Schomer, and Combs individually)**

11  230.   Plaintiffs incorporate by reference paragraphs 1 through 224 above.

12  231.   Plaintiffs Wilmuth, Schomer, and Combs each engaged in protected

13  opposition to what they believed in good faith to be unlawful discrimination against them.

14  232.   Defendant took adverse employment actions against Plaintiffs, including

15  substantively demoting them, because they engaged in protected opposition activity.

16  233.   Defendant further retaliated against Plaintiff Wilmuth by terminating her

17  employment because she engaged in protected opposition activity.

18  234.   Defendant further retaliated against Plaintiff Combs by creating

19  intolerable working conditions, which forced her to resign from her employment.

20  **SEVENTH CLAIM**

21  **FAMILY AND MEDICAL LEAVE VIOLATIONS**

22  **(on behalf of Plaintiffs Wilmuth, Schomer, and Combs Individually)**

23  235.   Plaintiffs Wilmuth, Schomer, and Combs incorporate by reference

24  paragraphs 1 through 234 above.

25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 45

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

236.     Plaintiff Combs took FMLA leave between March 20, 2023 and June 11, 2023 and short-term disability from June 12 to July 18, 2023.

237.     Plaintiff Wilmuth took FMLA leave between March 15, 2023 and June 14, 2023.

238.     Plaintiff Schomer took FMLA leave between May 5, 2023 and August 2, 2023.

239.     Defendant failed to restore Plaintiff Combs to the same or equivalent position upon her return from FMLA leave, in violation of RCW 50A.35.010 and 29 C.F.R. § 825.214.

240.     Defendant further discriminated and/or retaliated against Plaintiffs Wilmuth, Schomer, and Combs following their FMLA leave, in violation of RCW 50A.35.010 and 29 C.F.R. § 825.214, by placing Ms. Schomer if Focus and then Pivot, creating intolerable working conditions, which forced Ms. Combs to resign from her employment, and terminating Ms. Wilmuth's employment.

## EIGHTH CLAIM

### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

#### (on behalf of Plaintiffs Wilmuth and Combs individually)

241.     Plaintiffs Wilmuth and Combs incorporate by reference paragraphs 1 through 240 above.

242.     Amazon terminated Ms. Wilmuth's employment after she repeatedly complained of discrimination and retaliation, took protected FMLA leave, filed the instant lawsuit, and while she was out on approved short-term disability leave.

243.     Following Plaintiff Combs' complaints of unequal and discriminatory treatment, and taking FMLA medical leave, Amazon subjected her to working conditions that

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

violated public policy, in that she was subjected to discrimination and retaliatory treatment, including substantively demoting her, removing her direct reports and work, downgrading her performance evaluation resulting in reduced compensation eliminating any potential opportunity for promotion, and reassigning her to a role in which she was set up to fail, among others.

244.    Plaintiff Combs was forced to resign from her employment because her working conditions were so intolerable that she had no reasonable alternatives.

245.    Amazon's unlawful conduct caused Plaintiffs to suffer, and continue to suffer, damages including, but not limited to, past and future loss of income and benefits.

## NINTH CLAIM

### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000e *et seq.*

**(on behalf of Plaintiffs Wilmuth, Schomer and Combs Individually)**

246.    Plaintiffs Wilmuth, Schomer, and Combs incorporate by reference paragraphs 1 through 245 above.

247.    Plaintiffs Wilmuth, Schomer, and Combs are members of a protected class (female).

248.    Plaintiffs Wilmuth, Schomer, and Combs were treated less favorably with respect to the terms or conditions of their employment because of their gender.

249.    Defendant demoted Plaintiffs Wilmuth, Schomer, and Combs, fired Ms. Wilmuth, and constructively discharged Ms. Combs because of their gender.

## TENTH CLAIM

### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000e *et seq.*

**(on behalf of Plaintiffs Wilmuth, Schomer and Combs Individually)**

250.    Plaintiffs Wilmuth, Schomer, and Combs incorporate by reference

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 47

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

paragraphs 1 through 249 above.

251.    Plaintiffs Wilmuth, Schomer, and Combs each engaged in protected opposition to what they believed in good faith to be unlawful gender discrimination.

252.    Defendant took adverse employment actions against Plaintiffs, including demoting them, because they engaged in protected opposition activity.

253.    Defendant retaliated against Plaintiff Wilmuth by terminating her employment because she engaged in protected opposition activity.

254.    Defendant further retaliated against Plaintiff Combs by creating intolerable working conditions, which forced her to resign from her employment.

## X.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendant and relief as follows:

A.    Certification of the case as a class action on behalf of the proposed Class, designation of Plaintiffs as representatives of the Class, and designation of Plaintiffs' counsel of record as Class Counsel;

B.    Certification of the case as a collective action under the EPA on behalf of the proposed Collective, designation of Plaintiffs as representatives of the Collective, prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the Collective, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b), and tolling of the statute of limitations on the claims of all members of the Collective from the date the original Complaint was filed until the Collective Members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 48

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1   opt in as Collective Action Plaintiffs;

2   C.   Trial by jury;

3   D.   Back pay with prejudgment interest, in amounts to be determined at trial,

4   and other relief necessary to make Plaintiffs, Collective Members, and

5   Class Members whole for past and future pecuniary losses resulting from

6   the unlawful employment practices described;

7   E.   Front pay, in amounts to be determined at trial, and other relief necessary

8   to make Plaintiffs whole for pecuniary losses resulting from the unlawful

9   employment practices described;

10   F.   Damages for any and all forms of emotional distress Plaintiffs, Collective

11   Members, and Class Members have experienced, including but not limited

12   to humiliation, loss of enjoyment of life, pain and suffering, personal

13   indignity, embarrassment, fear, sadness, anger, anxiety, and anguish, in

14   amounts to be established at trial;

15   G.   Double damages or exemplary damages for EPOA violations pursuant to

16   RCW 49.58.070;

17   H.   Pre- and post- judgment interest to the extent authorized by law;

18   I.   Any and all other actual damages, costs, and expenses;

19   J.   Service payments to the representatives of the Class and the Collective;

20   K.   Reasonable attorney's fees and costs;

21   L.   Monetary relief for any adverse tax consequences of their awards; and,

22   M.   Any and all such other relief as the Court deems just and proper.

23

24

25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 49

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800

1

DATED this 9th day of February, 2024.          OUTTEN & GOLDEN LLP

2

3                                                        *Cassandra Lenning*

                                               By: _____
4                                                  Cassandra W. Lenning, WSBA #54336
                                                   Jahan C. Sagafi*
5                                                  Menaka N. Fernando*
                                                   One California Street, Suite 1250
6                                                  San Francisco, CA 94111
                                                   Telephone: (415) 638-8800
7
                                                   Adam T. Klein*
8                                                  Cara E. Greene*
                                                   Chauniqua Young*
9                                                  Michael C. Danna*
                                                   Lindsay M. Goldbrum*
10                                                 685 3rd Ave 25th Floor
                                                   New York, NY 10017
11                                                 Telephone: (212) 209-0675

12                                                 Jennifer Davidson*
                                                   1225 New York Ave NW, Suite 1200B
13                                                 Washington, DC 20005
                                                   Telephone: (202) 918-5476
14
                                                   *admitted pro hac vice
15

16

17

18

19

20

21

22

23

24

25

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 50

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE OF SERVICE**

I certify that on February 9, 2024, I caused the foregoing First Amended Complaint –
Class and Collective Action to be electronically filed with the Clerk of the Court using the
CM/ECF system, which sent notification of such filing to all counsel of record.

DATED this 9th day of February, 2024.                    OUTTEN & GOLDEN LLP

By: _Cassandra Lenning_____
Cassandra W. Lenning, WSBA #54336
One California Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 638-8800

FIRST AMENDED COMPLAINT
Case No. 2:23 Civ. 01774
Page 51

**Outten & Golden LLP**
One California Street, Suite 1250
San Francisco, CA 94111
(415) 638-8800